FILED & JUDGMENT ENTERED
Steven T. Salata

Jan 19 2012

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_____
J. Craig Whitley
United States Bankruptcy Judge

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JONATHAN MACKENZIE MALONE and | ) | Chapter 7 |
| JOANNA NICOLE MALONE, | ) | Case No. 10-31855 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| JONATHAN MACKENZIE MALONE and | ) | |
| JOANNA NICOLE MALONE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adversary Proceeding |
| v. | ) | No. 10-3299 |
| | ) | |
| DANIEL GOLDEN, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER GRANTING
SANCTIONS FOR WILLFUL VIOLATIONS OF THE DISCHARGE
INJUNCTION**

**THIS MATTER** is before the court for trial on the complaint of the Plaintiffs, Jonathan and Joanna Malone ("Jonathan" and "Joanna" or, collectively, "the Malones"), who claim that the Defendant, Daniel Golden ("Daniel" or, collectively with his non-party wife, "the Goldens"), violated the discharge injunction of 11 U.S.C. § 524(a)(2) by

attempting to collect a debt previously discharged in bankruptcy. The parties presented their cases at trial on October 5, 2011. Heather Culp represented the Malones, and Daniel appeared pro se. After considering each party's evidence and argument, the court agrees with the Malones that Daniel's phone calls and emails in November and December of 2010 were attempts to coerce payment of a discharged debt in violation of the discharge injunction. Accordingly, the court orders Daniel to pay to the Malones $1,000.00 in actual damages, $1,000.00 in punitive damages, and their costs of action and attorney's fees. In addition, Daniel is permanently enjoined from further contact with the Malones.

**BACKGROUND**

The parties to this adversary proceeding present an unfortunately familiar example of a friendship that soured as a result of financial problems. Joanna and Daniel's wife met almost ten years ago when they worked together. The relationship between the couples grew over the following years. Jonathan and Daniel worked together at a financial services firm, and Joanna babysat the Goldens' children. Before the relationship soured the couples were close enough that the Goldens selected the Malones as the godparents for their children.

When the Malones experienced financial difficulties in November 2007, the Goldens offered to help with an interest-free loan of $9,000.00. Two additional loans followed in December 2008 that left the Malones indebted to the Goldens in the total amount of $14,700.00. While the Goldens felt financially secure enough to make loans to the Malones in 2007 and 2008 (at least partially due to refinancing a mortgage), by 2009 the Goldens' own financial situation had deteriorated. On August 31, 2009, the

Goldens filed a Chapter 7 bankruptcy petition, case number 09-32361, in this court. The Goldens did not list the debt owed by the Malones in their bankruptcy schedules.[1]

Despite the omission of the loan from his bankruptcy disclosures, Daniel attempted to collect the debt from the Malones during and after his bankruptcy. Records of the parties' communications[2] show that the relationship between the couples was significantly strained at this time as a result of the debt. While she was unsure of the exact date or time period when the relationship between the two couples changed, Joanna testified that her last communication with Daniel's wife occurred in July 2009 and the relationship was already strained at that point.[3] Daniel and Jonathan exchanged a series of cryptic and occasionally angry emails over the summer of 2009. *See, e.g.*, Defendant's Ex. 10.

On October 24, 2009, while his bankruptcy was still open, Daniel sent a lengthy email discussing his unhappiness with Jonathan's use of money for purposes other than repaying the loan. *See* Defendant's Ex. 5 ("Financial decision making like that are [sic] what makes me mad. I consider it flat out selfish."). This email references an angry conversation between the two men "a few months ago" and indicates that, while "there is always hope," Daniel expects Jonathan will be unable to deny himself "beer, cigarettes,

---

[1] Daniel told the court at two different hearings during this adversary proceeding that he intended to reopen his bankruptcy case in order to add the debt to the Malones. To date, he has not.
[2] Each party to this dispute introduced copies of numerous email communications between Daniel and Jonathan into evidence. Given the court's uncertainty about the reliability of the testimony of Daniel and Jonathan, *see infra* note 3, the court bases many of its findings on these emails.
[3] The court found Joanna's testimony, unlike the two male witnesses, to be fully credible. Jonathan's testimony was marked by an inability to recall facts and details. At one point he claimed not to be able to recall a statement he made from the witness stand ten seconds earlier. (Jonathan's forgetfulness may have been at least partially caused by cross-examination by a pro se litigant who seemed intent on using irrelevant details to embarrass.) Daniel's testimony struck the court as extremely self-serving. While Jonathan couldn't remember much, Daniel claimed to vividly remember almost all of his actions, thoughts, and motivations, which were (according to him) completely unimpeachable (except when he wanted to harm Jonathan's credibility, or perhaps intimidate him, by discussing their mutual visits to adult entertainment establishments or use of marijuana).

[visits to adult entertainment clubs], and tattoos" even though he should use any available money to repay the loans. *Id.* Daniel indicates that his anger makes it difficult for him "to keep [the communication] civilized." *Id.*

When the October 24 email failed to produce the desired results, Daniel sent a letter, dated December 30, 2009 (two weeks after the Goldens received their bankruptcy discharge), via certified mail to the Malones' house and via email to Joanna's personal account and to Jonathan's work and personal accounts. *See* Plaintiff's Ex. 2. The letter instructed the Malones to begin paying $250 a month on the loans in January 2010. *Id.* Daniel enclosed self-addressed, stamped envelopes and a spreadsheet for recording the proposed payments. *See id.* The letter vaguely threatens "the next steps" if the Malones do not make the first payment by January 10. *Id.*

The Malones did not make a payment, and, on February 10, 2010, Daniel sent an email indicating he "expected" a payment by 6 PM that evening. *See* Plaintiff's Ex. 3. This brief email concludes: "Tomorrow may be a bad day." *Id.* While Daniel later claimed that he simply meant " 'it may be hard to contact me tomorrow,' " Plaintiff's Ex. 20, the Malones reasonably interpreted the "bad day" comment more ominously. Jonathan testified that he received the email while he was out of town on business and immediately called home and considered cancelling his trip.

Around this time the Malones began consulting an attorney and preparing to file bankruptcy.[4] *See* Plaintiff's Ex. 21. Jonathan told Daniel of these plans and reiterated

---

[4] Although the record does not show an exact date, around this time Daniel moved from North Carolina to Texas, where he currently resides. Another uncertainty from the record is the exact date when the friendly relationship between the Malones and Daniel completely ended. Joanna testified that she had no contact with the Goldens starting near the beginning of 2009, although she conceded some social contacts during that year on cross-examination. Jonathan testified that by February 2010 the only subject of conversation between he and Daniel was the loan. Regardless of the exact date, the court finds that by the time the

4

that he still planned to repay the Goldens when he could.[5] *See id.* A few months later, in late May/early June 2010, before the Malones filed bankruptcy, Daniel sent emails expressing his displeasure with Jonathan spending money on a business trip to San Diego. *See* Plaintiff's Ex. 5. Jonathan testified that he did not know how Daniel learned of the trip. In one of these messages Daniel demands "a good faith payment" on the loans. *Id.* He says he does not "want to sound or be harsh, but the alternative method, Denise's method,[6] would be much worse." *Id.* Joanna testified that the Malones did not know what "Denise's method" was at the time. Daniel explained in an email over a year later that "Denise's method" involved telling Joanna about her husband's scandalous behavior that the Goldens believed Jonathan kept secret from his wife. *See* Plaintiff's Ex. 21.

The Malones filed their bankruptcy on June 29, 2010. It appears that the Malones and the Goldens had no contact whatsoever from June 9, 2010, when Jonathan told Daniel in an email that the Malones intended to file bankruptcy at the end of the month, until five months later, near the end of the Malones' bankruptcy. *See* Defendant's Ex. 38. On November 3, Daniel sent a cryptic email to Jonathan's personal email account that stated, in its entirety, "I assume the loop has been closed?" Plaintiff's Ex. 7. The Malones did not respond to this email. The Court entered the Malones' Discharge of

---

Malones filed their Chapter 7 bankruptcy in June 2010, the relationship was primarily a debtor/creditor relationship and the parties were no longer on friendly terms.

[5] Daniel apparently believes that the Malones' "under the table" plan to file bankruptcy and subsequently repay the debt to the Goldens violates bankruptcy law. *See* Plaintiff's Ex. 21. The court does not know if the Malones ever intended to follow through with this "plan" or were simply trying to get a creditor to leave them alone before their bankruptcy. Regardless, the Bankruptcy Code does not forbid voluntary payments by debtors on previously discharged debts. *See* 11 U.S.C. § 524(f). However, the Code only allows post-discharge contractual liability for pre-petition debt when the debt is reaffirmed pursuant to section 524, which did not occur with Golden loan, and the discharge injunction, as discussed in the remainder of this order, forbids attempts to collect pre-petition debts that are not reaffirmed. *See* 11 U.S.C. § 524; *In re Cherry*, 247 B.R. 176, 183 (Bankr. E.D. Va. 2000) ("A reaffirmation agreement which does not comply with § 524 is void and unenforceable.").

[6] "Denise" is Daniel's wife, Denise Golden.

Joint Debtors and Final Decree on November 12 and mailed copies of each to the Malones' creditors, including Daniel, on November 14. The Discharge of Joint Debtors included the following warning to creditors, under the heading "Collection of Discharged Debts Prohibited":

> The discharge prohibits any attempt to collect from the debtor(s), a debt that has been discharged. For example, a creditor is not permitted to contact a debtor by mail, phone, or otherwise, to file or continue a lawsuit, to attach wages or other property, or to take any other action to collect a discharged debt from the debtor.

On November 23, Daniel sent an email to Jonathan under the subject "Bankruptcy." *See* Plaintiff's Ex. 8. This email, which Daniel sent to Jonathan's personal and work email accounts, asked, "Where does it stand? I haven't received anything from your attorney in quite some time." *Id.* The Malones did not reply to this email and instead contacted their bankruptcy attorney, Heather Culp. Culp sent Daniel a certified letter, dated November 30, that warned that his emails to Jonathan violated the section 524 discharge injunction and that further attempts to contact the Malones would result in the matter being brought before the court. *See* Plaintiff's Ex. 10. On December 2, Daniel sent another email to Jonathan's personal and work accounts that asked, "Does that mean that you are no longer responding to emails?" Plaintiff's Ex. 9. On December 3, Culp's paralegal emailed a copy of the certified letter to Daniel. *See* Plaintiff's Ex. 10.

Daniel received but did not heed Culp's warning. Instead, he increased his attempts to contact the Malones by sending more emails to Jonathan, some of which he also sent to Joanna, and calling the Malones on the telephone. Daniel testified that his own records[7] show that he called the Malones at various work and personal numbers

---

[7] Daniel testified that he keeps logs of all of his telephone calls.

6

nineteen times between December 5 and December 10. Daniel sent emails to Jonathan on December 5 and December 8.[8] *See* Plaintiff's Ex. 12; Defendant's Ex. 38.

On December 9, the Malones filed a motion to reopen their bankruptcy case and a motion for sanctions against Daniel. Culp emailed copies of both motions to Daniel on the same date. *See* Plaintiff's Ex. 14. Even receipt of the motion for sanctions did not deter Daniel from attempting to contact the Malones. After receiving the motions, Daniel sent at least four emails to the Malones on December 9 and 10. *See* Plaintiff's Ex. 15; Plaintiff's Ex. 17. Daniel sent one of these emails, with the subject "Joanna's phone?," to Joanna's email account as well as Jonathan's personal and work accounts. *See* Plaintiff's Ex. 15. This email indicates that Daniel plans to call Joanna if Jonathan does not respond. *See id.* Daniel also attempted to contact the Malones by phone on December 9 and 10.

The Malones testified that they had Daniel blocked from their phones and email accounts in early or mid-December, and, according to his testimony, Daniel stopped calling and emailing around the same time. The only subsequent contact occurred on December 23 when Daniel attempted to delete Jonathan from his online chat contact list and accidentally sent an invite instead. *See* Plaintiff's Ex. 22. Daniel sent an email explaining the accidental contact and apologizing.[9] *Id.* Jonathan testified that he believed Daniel's explanation that this contact was accidental.

---

[8] On December 8, Jonathan responded to one of Daniel's prior emails in a brief email asking, "What's up?" Plaintiff's Ex. 19. Jonathan testified that he did so in a (failed) attempt to stop the deluge of phone calls to his home and office.

[9] Neither party explained or discussed the inconsistency in the evidence between the Malones' testimony that they had Daniel's emails blocked in early or mid-December and their introduction of an email sent by Daniel on December 23 into evidence. The Malones' receipt of the December 23rd email supports Daniel's claim that he stopped emailing on or about December 10.

7

The Malones filed this adversary proceeding on December 10, 2010. The court issued a temporary restraining order against Daniel on December 13 and a preliminary injunction on December 16. While Daniel did correspond with Culp and the court, he did not appear or answer the Malones' complaint, and the court granted entry of default on January 20, 2011. The Malones moved for a default judgment and a permanent injunction on January 27. On February 16, Daniel requested a continuance of the default judgment hearing set for the following day. The court denied his motion and granted the Malones' motions. Daniel moved to vacate the default judgment and the permanent injunction on March 3. The court granted Daniel's motion on April 11, which set the stage for the trial on October 5.

## DISCUSSION

With certain exceptions not relevant to this matter, debtors who file a Chapter 7 bankruptcy receive a discharge of their pre-filing debts. *See* 11 U.S.C. § 727. Section 524(a)(2) of the Bankruptcy Code explains that a bankruptcy discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such [discharged] debt as a personal liability of the debtor." 11 U.S.C. § 524(a)(2). Consistent with providing debtors with a financial "fresh start," one of the primary goals of the Bankruptcy Code, the "discharge injunction" protects debtors from any attempt by creditors to collect discharged debts. *See In re Cherry*, 247 B.R. 176, 182 (Bankr. E.D. Va. 2000).

As a threshold matter, Daniel argues that he did not violate the discharge injunction because none of his communications were acts to collect the discharged debt

owed by the Malones.[10] Daniel points out that he did not explicitly ask for repayment or mention the debt in his post-discharge emails and phone calls. He told the court that all of the post-discharge communications were simply attempts to reconnect with old friends. Since section 524(a)(2) only prohibits attempts to collect discharged debts, *see, e.g.*, *In re Schlichtmann*, 375 B.R. 41, 97 (Bankr. D. Mass. 2007) ("If an act is not in fact one to collect or enforce a prepetition debt, then whatever its faults, it is not a violation of the discharge, even though undertaken by the holder of a discharged debt."), Daniel believes his calls and emails are immune from sanction by this court.

While the court admits that the interplay of a friendly relationship and a discharged debt could make determining whether post-discharge communications violate the discharge injunction a difficult call in certain circumstances, this is not that case. The court rejects Daniel's claim that his calls and emails were innocent, friendly communications for several reasons. First, the friendly relationship between Daniel and the Malones appears to have ended prior to the latter's bankruptcy. Jonathan testified that by February 2010, four months before the Malones filed bankruptcy, there was no friendly contact between the parties and the only topic of discussion was the loan. Joanna testified that she did not remember much contact with the Goldens after early 2009. The absence of any other reason for a creditor's act other than coercion is circumstantial evidence of the creditor's motives. *In re Paul*, 534 F.3d 1303, 1309 (10th Cir. 2008); *In re Pratt*, 462 F.3d 14, 20 (1st Cir. 2006).

Similarly, neither side contradicted the emails that indicate there was absolutely no contact between the parties for the approximately five months that the Malones were

---

[10] Daniel's defense could also be interpreted as a lack of intent to violate the discharge injunction. The court discusses this aspect of Daniel's argument *infra*.

9

in bankruptcy. The automatic stay does not prevent social communications between friends, *see* 11 U.S.C. § 362(a), but Daniel waited until the end of the bankruptcy to resume contact. Daniel's pattern of communication is more consistent with a creditor attempting to avoid the automatic stay than social contact. In addition, when Daniel resumed contact, the first emails he sent to the Malones after their bankruptcy filing either explicitly or implicitly refer to the bankruptcy and indicate that the purpose of Daniel's communications was not primarily to check in on old friends. The first post-bankruptcy email cryptically asks if "the loop has been closed." Plaintiff's Ex. 7. Both parties agreed that "the loop" referred to the Malones' bankruptcy case. The subject line of Daniel's next email is "Bankruptcy." Plaintiff's Ex. 8. After receiving warnings from the Malones' attorney Daniel became more careful with his diction, but that does not mean that the subsequent communications were not attempts to collect the debt. For example, calling nineteen times in six days is more consistent with a creditor attempting to collect a debt than simply trying to check in on friends, especially after the alleged friends have indicated that they were not interested in any contact.

Pre-discharge acts provide circumstantial evidence of the motives for post-discharge communications. *See In re Lumb*, 401 B.R. 1, 8 (B.A.P. 1st Cir. 2009). Before the Malones filed bankruptcy Daniel used vague threats to encourage[11] the Malones to repay the debt, and, although he chose his words more carefully, he continued the same behavior after their bankruptcy. One specific example is Daniel's attempts to encourage Jonathan to repay the debt by threatening to reveal his embarrassing behavior to Joanna. *Compare* Plaintiff's Ex. 5 (threatening, before the Malones' bankruptcy, to use "Denise's

---

[11] "Encourage" is a polite description of Daniel's use of threats. A less polite term for his behavior is "extortion."

method"), *with* Plaintiff's Ex. 15 (threatening, after bankruptcy, in an email with "Joanna's phone?" as the subject line, to contact Joanna if Jonathan refused to communicate). Violation of the discharge injunction does not require explicit demands for the repayment of a discharged debt. *See, e.g.*, *Paul*, 534 F.3d at 1308 ("[A] debtor may establish that a creditor who has taken an action not overtly prohibited by § 524(a)(2) nevertheless violated the discharge injunction, but to do so the debtor must 'prove not merely that [the creditor's] act is not what it appears to be, but that the act in question is one to collect a discharged debt *in personam*.' " (quoting *Schlichtmann*, 375 B.R. at 97)); *Pratt*, 462 F.3d at 19–20 (holding that creditor's refusal to release its lien on a worthless vehicle was "objectively coercive" in violation of the discharge injunction); *Lumb*, 401 B.R. at 7 ("To succeed on a complaint alleging a violation of the discharge injunction, a debtor need not allege that the creditor made an explicit threat; the objective test requires no such 'smoking gun.' "); *In re Moore*, 407 B.R. 855, 861 (Bankr. E.D. Va. 2009) (finding violation of the discharge injunction in law school's refusal to issue a diploma or provide a transcript). The court concludes that, based on the entirety of the circumstances, Daniel's emails and phone calls in November and December 2010 were acts to collect the discharged debt by coercion and harassment.

While section 524 does not expressly authorize monetary damages, most bankruptcy courts enforce the discharge injunction by treating violations as civil contempt of court. *See In re Bock*, 297 B.R. 22, 29 (Bankr. W.D.N.C. 2002) (cataloguing cases); *cf. In re Hardy*, 97 F.3d 1384, 1389 (11th Cir. 1996) (acknowledging the "modern trend" of punishing discharge violations with the court's inherent contempt power, but enforcing injunction with statutory contempt powers under 11 U.S.C. § 105 instead).

11

While there is some question of whether, in general, violations of court orders must be "willful" for sanctions to be imposed, bankruptcy courts usually examine the willfulness of a creditor's action when determining if the discharge injunction has been violated. *See In re Almond*, 2007 WL 1345224, at *5 & n.7 (Bankr. M.D.N.C. May 7, 2007). Sanctions for willful violations of the discharge injunction can include actual damages, attorney's fees, and punitive damages. *Cherry*, 247 B.R. at 187.

The Fourth Circuit has not determined the proper standard to determine the willfulness of discharge injunction violations. However, the Eleventh Circuit has developed a two-part test that treats discharge injunction violations in a manner similar to violations of the section 362 automatic stay. *See Hardy*, 97 F.3d at 1390. This test, which has been adopted by several bankruptcy courts in this circuit, *see, e.g.*, *In re Rountree*, 448 B.R. 389, 417–18 (Bankr. E.D. Va. 2011); *In re Kirkbride*, 2010 WL 4809334, at *4 (Bankr. E.D.N.C. Nov. 19, 2010); *Almond*, 2007 WL 1345224, at *5, examines: (1) whether the creditor knew of the discharge injunction; and (2) whether the creditor intended the actions that violated the injunction, *see Hardy*, 97 F.3d at 1390; *Almond*, 2007 WL 1345224, at *5; *Cherry*, 247 B.R. at 187. A similar test, developed in *Pratt* and primarily used in the First Circuit, adds a third element and finds a creditor at fault when "it (1) has notice of the debtor's discharge . . . ; (2) intended the actions which constituted the violation; and (3) acts in a way that improperly coerces or harasses the debtor." *Lumb*, 401 B.R. at 6.

It is important to note that willfulness in the context of contempt for violation of the discharge injunction does not require specific intent. *See Almond*, 2007 WL 1345224, at *5; *Cherry*, 247 B.R. at 187 ("[T]he state of mind with which the contemnor violated a

12

court order is irrelevant and therefore good faith, or the absence of an intent to violate the order, is no defense."). While the Fourth Circuit has not considered the criteria for determining the willfulness of an alleged discharge injunction violation, it has decided that specific intent is not required in the analogous context of alleged violations of the automatic stay. *See In re Strumpf*, 37 F.3d 155, 159 (4th Cir. 1994) ("To constitute a willful act, the creditor need not act with specific intent but must only commit an intentional act with knowledge of the automatic stay."), *rev'd on other grounds*, 516 U.S. 16 (1995).

With the foregoing in mind, the court has no trouble concluding that Daniel's post-discharge phone calls and emails to the Malones violated the discharge injunction under either the *Hardy* or the *Pratt* tests. Daniel had repeated notice of the Malones' discharge and actually knew of it when he communicated with the debtors. He received the court's discharge order that warned creditors not to contact the discharged debtors by "phone, mail, or otherwise." The Malones' attorney sent a warning letter. Then, the Malones filed motions to reopen their bankruptcy and sanction Daniel for his emails and calls. Daniel acknowledged receipt of the letter and motions, *see, e.g.*, Defendant's Ex. 40; Defendant's Ex. 41, but did not stop calling and writing the Malones.

Daniel's acts were willful in the sense that he intended the acts that violated the injunction. He intentionally called and emailed the Malones repeatedly. By way of example, Daniel's apparently accidental invitation to Jonathan to "chat," if in fact accidental, would not satisfy the willfulness requirement. *See In re Helmes*, 336 B.R. 105, 109 (Bankr. E.D. Va. 2005) (concluding that violation of discharge injunction requires "more than an inadvertent act or a clerical error"). However, intentionally

13

calling and writing discharged debtors is willful. Daniel's defense in relation to the willfulness of his actions is essentially that he lacked the specific intent to violate the discharge injunction. As stated previously, specific intent is not a requirement for a discharge violation and, therefore, lack of specific intent is no defense. *See In re Sanburg Fin. Corp.*, 446 B.R. 793, 804 (S.D. Tex. 2011) ("That [the creditor] may have not understood its actions to violate the discharge injunction . . . does not negate the willfulness finding, even if true.").

Punitive damages are available for particularly severe violations of the discharge injunction. *See Cherry*, 247 B.R. at 189–90 ("[W]hether expressed as 'egregious conduct,' 'malevolent intent,' or 'clear disregard of the bankruptcy laws,' each of these decisions [awarding punitive damages] appear to employ a finding of creditor conduct beyond willfulness or deliberation and more closely resembling a specific intent to violate the discharge injunction in order to assess punitive damages."). Despite Daniel's protestations to the contrary, the court finds that Daniel's failure to discontinue his barrage of calls and emails in the face of the warning letter and even the filing of a motion for sanctions to be egregious, malevolent, and in clear disregard of the bankruptcy laws and, therefore, subject to punitive damages.

Therefore, Daniel is liable for the Malones' actual damages, attorney's fees, and punitive damages as a result of his actions. There is little concrete evidence of their actual damages in the record. Jonathan testified that Daniel's actions interfered with his work schedule and caused him to miss several days of work entirely, but there is no evidence of the amount of his lost earnings (which may be at least partially because Jonathan is paid based solely on commissions). Joanna also testified that the Malones

14

had to hire babysitters for the family's four kids in order to consult with their attorney, but the court received no evidence of the exact cost. Despite the lack of evidence of the expense caused by Daniel's actions, the court can still estimate an appropriate amount to reimburse the Malones. *See In re Pague*, 2010 WL 1416120, at *8 (Bankr. N.D. W. Va. Apr. 5, 2010) ("[W]hile the precise amount of compensatory damages is indeterminable based upon the record, the court finds that, due to the clear violations of the discharge injunction by the Defendant, and the obvious effort required of the Debtor to vindicate it, he is entitled to a compensatory award."). There was also testimony about the stress and distraction Daniel caused, but emotional distress damages are not available for discharge injunction violations (or other civil contempt) in the Fourth Circuit. *See In re Walters*, 868 F.2d 665, 670 (4th Cir. 1989); *Pague*, 2010 WL 1416120, at *7.

The Malones stressed to the court that their goals in pursuing this action against Daniel were to permanently bar future contact by him and to have their attorney's fees paid. The court will grant their wishes. While the logic of issuing an injunction to enforce an injunction is questionable, *see Schlichtmann*, 375 B.R. at 103 ("The discharge is itself an injunction against the very conduct it prohibits, so a further injunction of the same nature would only be redundant."), the court will, at a minimum, warn Daniel that the Malones do not want any contact with him and that the court will take a dim view of any future attempts to contact the Malones, even if he tries to disguise his communications as friendly chit-chat.

Accordingly, it is **ORDERED**:

(1)     Consistent with the discharge injunction, Daniel is permanently enjoined from contacting or attempting to contact the Malones.

(2) Daniel is in contempt of court for his willful violations of the discharge injunction.

(3) To purge his contempt and as compensation, Daniel is ordered to pay the following sums to the Malones within ninety (90) days of entry of this order:

  a. Actual damages in the sum of $1,000;

  b. Punitive damages in the sum of $1,000; and

  c. The Malones' costs of this action and attorney's fees. To determine the amount of this award, the Malones will submit an accounting to Daniel within three (3) weeks of the entry of this order. Daniel will then have two (2) weeks to file any written objections to or comments on the Malones' accounting. Each party will submit its version of the accounting to the court within five (5) weeks of the entry of this order. The court will then determine the proper amount of this award and enter a supplemental order.

(4) A compliance hearing will be held on May 10, 2012 at 9:30 AM at the Charles Jonas Federal Building, 401 West Trade Street, Charlotte, North Carolina.

**SO ORDERED.**

This Order has been signed electronically.            United States Bankruptcy Court
The judge's signature and the court's seal
appear at the top of the Order.